**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**WHITE COAT WASTE PROJECT,**

    **Plaintiff,**

        **v.**

                             **Civil Action No. 23-1866 (JEB)**

**WASHINGTON METROPOLITAN AREA**
**TRANSIT AUTHORITY,** *et al.,*

    **Defendants.**

<u>**MEMORANDUM OPINION**</u>

    For years, the Washington Metropolitan Area Transit Authority, which operates the public-transportation system here, has raised revenue by permitting speakers to air their thoughts and advertise their wares in its buses, subway cars, and stations.  This case concerns the constitutionality of three recent WMATA restrictions on the content of such displays.  Plaintiff White Coat Waste Project submitted four proposed ads criticizing government-funded experimentation on animals.  After three were rejected under WMATA's advertising-content guidelines, the organization sued the Authority and its general manager for violations of its free-speech and due-process rights.  Defendants have now moved to dismiss, contending that WMATA is immune from suit and that their policies pass constitutional muster.  As the Court largely agrees, it will grant the Motion for the most part, but deny it as to one guideline.

**I.**      **Background**

    The Court draws the facts from the Complaint, as required at this stage.  White Coat is a non-profit watchdog organization that aims to "unite animal-lovers and liberty-lovers to expose and end wasteful taxpayer-funded animal experiments."  ECF No. 1 (Compl.), ¶ 8.  On April 13,

2023, it contacted Outfront Media — the company that manages WMATA's advertising sales and placement — to place four advertisements.  Id., ¶ 21.

The first depicts a logo stating, "Stop Government Animal Experiments" next to White Coat's name and above a line of text that reads, "Stop the Money. Stop the Madness!"  Id., ¶ 20.



In another, a dog's head rests near a table and its snout is dusted with a white, powdery substance.  The substance (presumably meant to represent cocaine) is arranged in a line on the table.  Id.  White Coat's name and logo appear in the upper-right corner, and to the left is text stating, "You paid $2.3 mil in taxes for this!"  Id.



A third ad labeled "NIH's Fight Club" shows two cartoon hamsters engaged in bloody combat.  It states, "You paid $1.5 mil in taxes for this!" and depicts White Coat's name and logo in the bottom-right corner.  Id.



The final ad is just a black screen with White Coat's name, a QR code, and a statement: "Shop Now!"  The code links to a webpage where the organization sells t-shirts displaying its "Stop Government Animal Experiment" logo.  Id., ¶ 23.



Roughly two weeks after the ads' submission, Outfront informed White Coat that it had rejected the first three because they were each barred by certain WMATA Commercial Advertising Guidelines, which state as follows: (1) "Advertis[ements] intended to influence members of the public regarding an issue on which there are varying opinions are prohibited" (Guideline 9); (2) "Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited" (Guideline 13); and (3) "Advertisements that are intended to influence public policy are prohibited" (Guideline 14).  Id., ¶¶ 16–18, 22.  As to the fourth ad, Outfront noted that it was unable to complete its review

because the QR code linked to a "placeholder page."  Id., ¶ 22.  After White Coat resubmitted the fourth ad with a functioning link to its webpage in late May 2023, Outfront approved it.  Id., ¶¶ 23–24.

The three rejections galvanized White Coat to sue WMATA and its then-Interim General Manager Andy Off on June 27, 2023.  Plaintiff alleges that Guidelines 9, 13, and 14 violate the First Amendment because they each discriminate against its viewpoint (both facially and as applied) and lack a workable standard.  Relatedly, it asserts that they are impermissibly vague in violation of the Fifth and Fourteenth Amendments.  Id., ¶¶ 35–45.  Defendants have now moved to dismiss.

## II.   Legal Standard

Defendants' Motion invokes the legal standards for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  When a defendant brings a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, "[t]he plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence."  Bagherian v. Pompeo, No. 19-1049, 2020 WL 674778, at *2 (D.D.C. Feb. 11, 2020) (quoting Didban v. Pompeo, 435 F. Supp. 3d 168, 174 (D.D.C. 2020)).  The Court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  Am. Nat'l Ins. Co v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).

To survive a motion to dismiss under Rule 12(b)(6), conversely, a complaint must "state a claim upon which relief can be granted."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 552 (2007).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, [if] accepted as true, to

'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Though a plaintiff may survive a Rule 12(b)(6) motion even if "'recovery is very remote and unlikely,'" the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## III.  Analysis

At the outset, Defendants assert that WMATA (but not its general manager) is immune from suit under the Eleventh Amendment.  See ECF No. 10 (MTD) at 4–8.  As this defense implicates the Court's subject-matter jurisdiction, see Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1138 (D.C. Cir. 2015), the Court addresses it first before turning to the merits.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).

### A.  Sovereign Immunity

The parties agree that, as the product of an interstate compact among the District of Columbia, Virginia, and Maryland, WMATA is "generally protected by sovereign immunity unless, and to the extent, it waives it."  ECF No. 30 (Pl. Opp.) at 30; MTD at 5; see also Oviedo v. Wash. Metro. Area Transit Auth., 948 F.3d 386, 393 (D.C. Cir. 2020) ("WMATA enjoys the same immunity from suit as its State signatories."); Watters v. Wash. Metro. Area Transit Auth., 295 F.3d 36, 39 (D.C. Cir. 2002) ("[T]he three signatories [to the WMATA Compact] conferred each of their respective sovereign immunities, including the Eleventh Amendment immunity of the two states, upon [WMATA].").  They further agree that the sole potential basis for waiver is Section 80 of the Compact, which waives sovereign immunity as to WMATA's contracts and torts "committed in the conduct of any proprietary function" but not as to torts "occurring in the performance of a governmental function."  D.C. Code § 9–1107.01(80); see MTD at 5–6; Pl.

6

Opp. at 30. And both sides appear to assume that the free-speech and due-process violations alleged in the Complaint are "torts" within the meaning of the waiver. See Am. C.L. Union Found. v. Wash. Metro. Area Transit Auth., 2023 WL 4846714, at *2 (D.D.C. July 28, 2023) (assuming without deciding that "Plaintiffs' claims qualify as 'constitutional torts'" and citing Memphis Community School District v. Stachura, 477 U.S. 299, 305–06 (1986), for support). As a result, the parties devote their attention exclusively to the category — *i.e.*, proprietary or governmental — in which White Coat's constitutional claims belong.

The Court, following that approach, concludes that WMATA has not waived its immunity because its choice of advertising policy is a governmental (rather than proprietary) function. As the D.C. Circuit has explained, that distinction turns on whether the challenged conduct is "discretionary, in which case [the plaintiff's claims are] barred by immunity, or ministerial, in which case [they] may proceed." Banneker, 798 F.3d at 1138. Conduct is discretionary if no "statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and the choice of action "is grounded in social, economic, or political goals." Id. (cleaned up). Both requirements are satisfied here. With respect to the first, because White Coat challenges WMATA's guidelines themselves as unconstitutional, the relevant question is whether that choice of policy is specifically prescribed. It is not. No statute, regulation, or policy requires that WMATA permit advertisements at all, let alone that it adopt the specific guidelines it has chosen.

As to the second requirement, the D.C. Circuit has already noted that WMATA, in adopting the guidelines, weighed the "economic benefit" of allowing issue-oriented advertising against the "adverse publicity," "security concerns," and "vandalism" that may result, as well as the "administrative burden" of reviewing the proposed ads and responding to complaints about

them.  See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 320 (D.C.

Cir. 2018).  These clearly implicate the Authority's "social, economic, or political goals," and

Plaintiff offers no argument to the contrary.  See Pl. Opp. at 32–33; Am. C.L. Union Found.,

2023 WL 4846714, at *3 (reaching same conclusion).

It bears mention that the Court, in any event, would be required to dismiss White Coat's

constitutional claims against WMATA for an even simpler reason that the parties do not raise: it

lacks a valid cause of action.  See Unsuck DC Metro v. Wash. Metro. Area Transit Auth., 2022

WL 683403, at *2 (D.C. Cir. Feb. 11, 2022) (defendants cannot "waive" cause of action "into

existence").  Those claims arise under 42 U.S.C. § 1983, which authorizes suits against any

"person who, under color of" state law, deprives "any citizen" of "rights, privileges, or

immunities secured by the Constitution and laws" of the United States.  See Compl., ¶ 5; Morris

v. Wash. Metro. Area Transit Auth., 702 F.2d 1037, 1042 (D.C. Cir. 1983).  But a state, and hence

also WMATA, is not a "person" within the meaning of that statute.  See Will v. Michigan Dep't

of State Police, 491 U.S. 58, 71 (1989); Headen v. Wash. Metro. Area Transit Auth., 741 F. Supp.

2d 289, 294 (D.D.C. 2010).  WMATA therefore may not be sued for its constitutional violations,

as several courts in this district have held.  See, e.g., Headen, 741 F. Supp. 2d at 294; McMillan

v. Wash. Metro. Area Transit Auth., 898 F. Supp. 2d 64, 69–70 (D.D.C. 2012); Disability Rights

Council v. Wash. Metro. Area Transit Auth., 239 F.R.D. 9, 20 (D.D.C. 2006); Lucero-Nelson v.

Wash. Metro. Area Transit Auth., 1 F. Supp. 2d 1, 7–8 (D.D.C. 1998).

The game is not up, however, as Plaintiff has also named as a Defendant the Authority's

general manager, Andy Off, in his official capacity.  See Compl., ¶ 10.  As he was the former

interim general manager, the current general manager, Randy Clarke, will be substituted pursuant

to Federal Rule of Civil Procedure 25(d).  Defendants do not offer any reason why the case

should not proceed against him, nor can the Court think of one.  See Pl. Opp. at 29 n.9; see also

Ex Parte Young, 209 U.S. 123 (1908); Am. C.L. Union Found., 2023 WL 4846714 (dismissing

WMATA from action but allowing case to proceed against its official); Will, 491 U.S. at 71 n.10

("[A] state official in his or her official capacity, when sued for injunctive relief, would be a

person under § 1983 because official-capacity actions for prospective relief are not treated as

actions against the State.") (cleaned up).

 B.  Failure to State Claim

 Moving now to the merits, Clarke argues that both of White Coat's constitutional claims

should be dismissed as insufficiently pled.  The Court first assesses whether the three advertising

guidelines violate Plaintiff's right to free speech and then examines the overlapping contention

that they are impermissibly vague.

 1.  *First Amendment*

 When the Government restricts speech on its own property — as it does here — the

Court's review under the First Amendment begins with the nature of the forum.  See Am.

Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., 901 F.3d 356, 364 (D.C. Cir. 2018).

Such property may be classified, for example, as a "traditional" or "designated" public forum —

a space that the state has opened to the public for expressive activity either as a matter of

longstanding tradition (*e.g.*, sidewalks and parks) or by fiat.  Id. (citing Perry Educ. Ass'n v.

Perry Loc. Educators' Ass'n, 460 U.S. 37, 45–46 (1983)).  Only content-neutral restrictions on

the time, place, and manner of speech or narrowly tailored content-based limits are permissible

in such a space.  Id.  Alternatively, the state may open its property for only limited speech — in

which case, the forum is "non-public," and restrictions on the subject matter and identity of the

speaker are allowed "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Id. at 365.

The question of where on that spectrum WMATA's buses, trains, and Metro stations fall need not long detain us, as the D.C. Circuit has squarely answered it: they are non-public forums. See Archdiocese, 897 F.3d at 322–23 ("[I]t is clear that WMATA's advertising space is [now] a non-public forum," given the decision by its Board of Directors in 2015 to "close its advertising space to specific subjects.") (cleaned up); AFDI, 901 F.3d at 364 ("we are bound to follow [the forum] decision" in Archdiocese).  In resisting this conclusion, White Coat notes that the Circuit's forum analysis depended on WMATA's "policy and practice" as informed by an "evidentiary record," and it insists that conducting that analysis prior to discovery is therefore "premature."  Pl. Opp. at 5.  Absent any allegation in the Complaint (or even the Opposition) that the Authority's policy has changed since the Circuit's decisions in 2018, the Court must decline White Coat's invitation to forestall what those cases make inevitable.

As WMATA's advertising spaces are non-public forums, Guidelines 9, 13, and 14 need only be (1) viewpoint neutral, and (2) reasonable in light of the forum's purpose to withstand First Amendment scrutiny.  The Court examines each issue in turn.

a.  Viewpoint Neutrality

The Supreme Court has emphasized that — except where the Government itself is the speaker — the Free Speech Clause of the First Amendment prohibits it from discriminating against particular points of view.  See Matal v. Tam, 582 U.S. 218, 234 (2017); Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content discrimination.").  In other words, the Government must "abstain from regulating speech when the specific motivating ideology or the opinion or

perspective of the speaker is the rationale for the restriction." Rosenberger, 515 U.S. at 829. "At its most basic, the test for viewpoint discrimination is whether — within the relevant subject category — the government has singled out a subset of messages for disfavor based on the views expressed." Matal, 582 U.S. at 248 (Kennedy, J., concurring); see also Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 806 (1985) ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.").

    White Coat contends that the guidelines are viewpoint discriminatory on their face and as applied to the facts of this case.

### i.   Facial Challenge

    Begin with the facial challenge. As to Guidelines 9 and 14 — which prohibit ads that are "intended to influence members of the public regarding an issue on which there are varying opinions" and that are "intended to influence public policy," respectively — it argues that they discriminate between controversial and anodyne messages: "[A]dvertising for something like McDonald's can come in because they are viewed as noncontroversial; advertisements like White Coat's are kept out because they are seen as controversial or challenging the status quo." Compl., ¶¶ 27, 29; see also Pl. Opp. at 19. As to Guideline 13 — which bars ads that support or criticize "an industry position or goal" without "direct commercial benefit to the advertiser" — White Coat proposes that the policy discriminates because it "would allow a pharmaceutical or medical device company to run an ad encouraging readers to '[d]efend a woman's right to choose,' while [a pro-choice non-profit organization] running the same ad would be censored." Compl., ¶ 28; Pl. Opp. 19. This, it insists, the Constitution does not abide.

None of these arguments is persuasive.  Consider, first, Guidelines 9 and 14.  Although it is true that "[g]iving offense is a viewpoint" and that WMATA may thus not preference uncontroversial opinions on subject matter it has chosen to allow, see Matal, 582 U.S. at 243 (plurality op.), those two guidelines do nothing of the sort.  Guideline 9, by its express terms, would allow provocative viewpoints concerning subject matter on which there is broad public consensus.  Guideline 14, similarly, would appear to permit controversial advertisements intended to boost a company's sales but not an innocuous plea for bipartisanship in Congress.  Whether an ad is permitted under the guidelines thus turns on its topic, not the viewpoint it espouses.

The Supreme Court's decisions in Matal and Iancu v. Brunetti, 139 S. Ct. 2294 (2019), do not counsel a different conclusion.  Contra Pl. Op. at 18, 25.  Matal struck down a clause within the Lanham Act prohibiting the registration of a trademark that "may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."  582 U.S. at 227 (quoting 15 U.S.C. § 1052(a)).  Iancu did the same to a separate clause of that Act rejecting marks that "consist of or comprise immoral or scandalous matter."  139 S. Ct. at 2298 (quoting § 1052(a)) (cleaned up).  The problem with the disparagement clause in Matal was that "[w]ithin [the] category" of "'persons, living or dead, institutions, beliefs, or national symbols, . . . an applicant may register a positive or benign mark but not a derogatory one," thus "reflect[ing] the Government's disapproval of a subset of messages it finds offensive."  582 U.S. at 248–49 (Kennedy, J., concurring).  Likewise, the "immoral or scandalous" bar in Iancu was viewpoint based because it allowed registration of marks "when their messages accord with, but not when their messages defy, society's sense of decency or propriety."  139 S. Ct. at 2300.  As examples of that distinction, the Court noted that the Patent and Trademark Office had

"rejected marks conveying approval of drug use" pursuant to that clause but permitted "marks

with such sayings as . . . SAY NO TO DRUGS," and rejected marks expressing support for al-

Qaeda, but not a mark stating, "WAR ON TERROR MEMORIAL."  Id. at 2300–01.  The issue

in both cases was not the exclusion of controversial subject matter, but the selective exclusion of

controversial opinions on permissible subjects, as evident in the plain text of the law.  Guidelines

9 and 14, while arguably censoring controversial topics, do not distinguish between controversial

and non-controversial viewpoints on those topics.

Additionally, like White Coat's forum-classification argument, its facial challenge to

these two prohibitions is already foreclosed, in a sense, by the D.C. Circuit's decision in AFDI v.

WMATA, 901 F.3d 356 (D.C. Cir. 2018).  In that case, WMATA had refused to display an

advertisement depicting the Prophet Muhammad with a speech bubble declaring, "YOU CAN'T

DRAW ME!" (among other things), id. at 360, and one of the issues before the panel was

whether Guideline 9, which it believed forbade an ad of that kind, was facially viewpoint neutral.

See id. at 368–69.  The Circuit affirmatively declared that such was the case.  Contra Pl. Opp. at

20; see AFDI, at 363 ("We . . . hold WMATA's restrictions are viewpoint-neutral."); id. at 373

("[I]t is clear WMATA did not engage in viewpoint discrimination in rejecting AFDI's

advertisement and adopting Guideline 9.").  Given that fact, at least as concerns the facial

validity of Guideline 9, the train has already left the station.  And the close similarity between

what Guidelines 9 and 14 prohibit would imply that the latter is viewpoint neutral as well.  See

id. at 363 n.5 (noting that "[t]here is some overlap between Guideline 9 . . . and Guideline 14,"

although the latter was not at issue in the case).

Finally, even if the Circuit had not affirmatively held that Guideline 9 was facially

viewpoint neutral — but merely rejected AFDI's contrary argument as unpersuasive — White

Coat's argument in this case is quite similar and would therefore fail for the same reason. AFDI's theory of viewpoint discrimination was that "an advertiser could claim its product is the best value, most efficient, or best tasting, but a religious person could not promote his religion as the best, most truthful, or most charitable," id. at 369, just as White Coat's theory boils down to the observation that Guidelines 9 and 14 would permit an advertisement for McDonald's over one criticizing taxpayer-funded experimentation on animals.  See Compl., ¶¶ 27, 29.  In both cases, the purported discrimination arises from WMATA's preference for speech on an entirely different subject matter.  The answer to White Coat is thus the same as the Circuit's answer to AFDI: it has articulated "a correct description of what is and is not acceptable under WMATA's policy — an advertiser can say whatever it wants about a permissible subject but cannot say anything about an impermissible subject — but this is not viewpoint discrimination; to hold otherwise would . . . erase the distinction between content-based and viewpoint-based restrictions."  AFDI, 901 F.3d at 369.

The facial challenge to Guideline 13 can be dispensed with quickly.  It permits an ad supporting or criticizing industry positions and objectives if it has a "direct commercial benefit to the advertiser" but not otherwise — drawing a distinction, in effect, between commercial and noncommercial speech.  That is plainly constitutional.  See Lehman v. City of Shaker Heights, 418 U.S. 298, 304 (1974) (plurality op.) ("In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation."); see also AFDI, 901 F.3d at 368 (Lehman held that "it was not unconstitutional for a government to ban noncommercial advertising in a place that was not [a] . . . public thoroughfare.  In contemporary terms, it is not facially viewpoint discrimination to ban political advertising in a nonpublic

forum.") (cleaned up); <u>Archdiocese</u>, 897 F.3d at 329 (noting "longstanding recognition that the government may limit a non-public forum to commercial advertising").  White Coat's only argument to the contrary, as referenced earlier, is that the policy would allow a medical-device company, but not a non-profit, to run a pro-choice ad.  <u>See</u> Pl. Op. at 19.  The logic of this argument escapes the Court, as that hypothetical bespeaks the exclusion of a class of speakers (which can be permissible in a non-public forum, <u>see</u> <u>AFDI</u>, 901 F.3d at 364), rather than a point of view.

### ii.  As Applied

Moving on to the as-applied challenge, the Complaint offers virtually no factual content that could justify allowing it to proceed.  It states, in conclusory fashion, that "WMATA . . . regularly accept[s] and display[s] advertisements that are intended to influence riders and the rest of the public to buy, do, and believe things that are at odds with White Coat's viewpoint," and that it has "accepted other advertisements related to social and political issues on which some portion of the public disagrees."  Compl., ¶¶ 31–32.  But it does not name a single example or explain the basis for these claims.  Nor does it allege anything to suggest that it was "singled out" for "disfavor" on account of its animal-rights advocacy.  <u>Matal</u>, 582 U.S. at 248 (Kennedy, J., concurring); <u>cf.</u> <u>People for Ethical Treatment of Animals, Inc. v. Shore Transit</u>, 580 F. Supp. 3d 183, 187, 197 (D. Md. 2022) (denying motion to dismiss viewpoint-discrimination claim where complaint referenced emails showing that defendant rejected its ads criticizing slaughterhouses specifically to protect local poultry plants during COVID-19 pandemic and because they were "too offensive" for its markets).  That inference is especially doubtful, in fact, given WMATA's decision to <u>approve</u> one of White Coat's ads linking to a webpage that

displayed t-shirts adorned with the organization's credo: "Stop Government Animal Experiments."  Compl., ¶¶ 23–24.  On this score, Plaintiff simply fails to state a claim.

None of the challenged guidelines, in sum, is viewpoint discriminatory on its face, and the Complaint is also insufficient to sustain an as-applied challenge.

### b.  Reasonableness

That conclusion, however, does not sound the death knell for Plaintiff's First Amendment claim, as any speech restriction in a non-public forum must also be reasonable.  AFDI, 901 F.3d at 365.  "The reasonability inquiry is not a demanding one, but rather is a forgiving test.  The challenged restriction need not be the most reasonable or the only reasonable limitation." Archdiocese, 897 F.3d at 329–30 (cleaned up).  It need satisfy only two conditions.  First, it must be "consistent with the government's legitimate interest in maintaining the property for its dedicated use."  AFDI, 901 F.3d at 370.  Second, it must guide the state's discretion by providing "objective, workable standards."  Id. at 372.

As in other components of the Court's analysis, the D.C. Circuit has already laid the first issue to rest.  As that court explained in AFDI, the purpose of the forum here is public transportation, and the guidelines are undoubtedly consistent with such use.  See 901 F.3d at 370–71.  WMATA closed the forum to issue-oriented advertisements in 2015 and introduced the challenged guidelines in response to several problems such ads had engendered, including complaints from customers and employees, vandalism, and security threats.  Id. at 360, 371. That decision represented what the Circuit has called an "eminently reasonable" calculation that "the game was not worth the candle" and that it was "better to lose some advertising revenue and avoid having to deal with the controversies [issue-oriented ads] create."  Id.; see also Archdiocese, 897 F.3d at 330 ("WMATA's closure of its forum to certain broad subjects is

reasonable in light of its core purpose and experience, and is responsive to the very circumstances that prompted WMATA to reevaluate its advertising approach.").  Plaintiff appears to concede this point.  See Pl. Opp. at 7–17 (addressing only administrability requirement).

The harder question is whether each of the guidelines supplies an objective and workable standard.  To answer it, a brief survey of the relevant caselaw is in order.

i.   Caselaw

The Supreme Court first introduced this requirement in <u>Minnesota Voters Alliance v. Mansky</u>, 138 S. Ct. 1876 (2018).  There, groups advocating for election reform in Minnesota sought to have their supporters appear at polls wearing buttons with the words "Please I.D. Me" (apparently in support of voter I.D. laws).  <u>Id.</u> at 1884.  At least one individual also sought to wear a "Tea Party Patriots" shirt.  <u>Id.</u>  They sued to enjoin enforcement of a Minnesota statute that bans any "political badge, political button, or other political insignia" at a polling place.  <u>Id.</u> at 1883.  After concluding that the polling place "qualifies as a nonpublic forum" and that Minnesota was pursuing a "permissible objective" in excluding certain forms of advocacy (<i>i.e.</i>, creating "an island of calm in which voters can peacefully contemplate their choices"), the Supreme Court nevertheless struck down the statute under the First Amendment as lacking a workable standard.  <u>Id.</u> at 1886–88, 1891–92 (quotation marks and citation omitted).

As the Court explained, "[T]he State must draw a reasonable line.  Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out."  <u>Id.</u> at 1888.  The political-apparel ban had failed to do so.  The Court took issue with "the unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State ha[d] provided in official guidance and representations to th[e] Court."  <u>Id.</u>  The word "political," it

17

noted, was not defined in the statute and could be "expansive" — potentially encompassing anything "relating to government . . . or the conduct of governmental affairs" or even "a button or T-shirt merely imploring others to 'Vote!'" Id. (citation omitted).  And the state's efforts to fashion a definition in briefing and argument only made matters worse.  For example, one of the categories of banned subjects it had identified — "[i]ssue oriented material designed to influence or impact voting"— only "raise[d] more questions than it answer[ed]," including "What qualifies as an 'issue'?" Id. at 1889.  The problem with such ambiguity, the Court explained, was that it "carries with it the opportunity for abuse" and the risk that "an election judge's own politics may shape his views on what counts as 'political.'" Id. at 1891 (cleaned up).

Relying on Mansky, several circuit courts have since struck down state policies purporting to ban "political" content in various non-public forums where the term was not adequately defined.  See Zukerman v. U.S. Postal Serv., 961 F.3d 431, 449–52 (D.C. Cir. 2020) (ruling that 2018 Postal Service policy on custom postage stamps allowing only "commercial" or "social" images that do not contain depictions of "political" content was unconstitutional); Ctr. for Investigative Reporting v. Se. Pennsylvania Transp. Auth., 975 F.3d 300, 314–17 (3d Cir. 2020) (same as to transit authority's Advertising Standards excluding ads that are "political in nature or contain political messages" and that "express[] or advocat[e] an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues"); Am. Freedom Def. Initiative v. Suburban Mobility Auth. For Reg'l Transp., 978 F.3d 481, 493–98 (6th Cir. 2020) (same as to transit authority's restriction on "political" ads); White Coat Waste Project v. Greater Richmond Transit Co., 35 F.4th 179, 188, 199–203 (4th Cir. 2022) (same as to transit authority's prohibition on "political ads," notwithstanding the authority's interpretation that an ad is "political" if "it is not viewpoint neutral — i.e., . . . express[es] a

viewpoint and only that viewpoint" or if it comes from a "political action group — i.e., any group that engages in a specific targeted policy advocacy that would be related to their one side of the political issue.") (cleaned up); see also Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth., 929 F.3d 643, 654 (9th Cir. 2019) (expressing "skeptic[ism]" that ad policy was facially reasonable where it prohibited ads that "express[] or advocat[e] an opinion, position, or viewpoint on matters of public debate about economic, political religious or social issues").

The Supreme Court and the D.C. Circuit have also, conversely, provided some guidance on the sort of language and context that could sufficiently constrain official discretion so as to render a speech restriction reasonable.  In Mansky, as examples of electioneering statutes with "more discernible" language, the Supreme Court cited a California law prohibiting "the visible display . . . of information that advocates for or against any candidate or measure" (and listing several examples), and a Texas law that barred wearing "a badge, insignia, emblem, or other similar communicative device relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of the election."  138 S. Ct. at 1891 (quoting Cal. Elec. Code Ann. § 319.5 (West Cum. Supp. 2018), and then Tex. Elec. Code Ann. § 61.010(a) (West 2010)).  It noted, however, that those provisions do not necessarily "set the outer limit of what a State may proscribe."  Id.

Indeed, even where a restriction on "political" speech is not defined with the kind of granularity evinced in those statutes, context can sometimes clarify the scope of what is prohibited.  Mansky cited with approval two prior cases in which the Supreme Court had upheld restrictions on "political" speech in non-public forums — Lehman, 418 U.S. 298, and Greer v. Spock, 424 U.S. 828 (1976).  See Mansky, 138 S. Ct. at 1886.  In Lehman, a candidate for the Ohio General Assembly who sought to purchase space on a city transit system to promote his

campaign was turned away under a policy prohibiting "political advertising in or upon any of [the city's] CARS."  418 U.S. at 299–300.  Likewise, in Greer, candidates for federal office were refused permission to distribute campaign literature and to hold a meeting with service personnel on a military base in New Jersey under a regulation prohibiting "(d)emonstrations, picketing, sit-ins, protest marches, political speeches and similar activities."  424 U.S. at 831–32.  Attempting to reconcile the Supreme Court's continued approval of these decisions (and to reconcile one prior D.C. Circuit case upholding a ban on "political advertisements" in a military newspaper, see Bryant v. Gates, 532 F.3d 888, 893 (D.C. Cir. 2008)) with Mansky's holding, the D.C. Circuit in Zukerman noted that in each of these cases "the government could point to at least some limiting standards — for instance, the ordinary meaning of the term 'advertising,' informed by all-important context — to define the scope of the term 'political' and render the prohibition on speech more objective and workable."  961 F.3d at 451.

In both Lehman and Greer, a key part of that context, no doubt, was a factual record showing a history of consistent enforcement.  See Lehman, 418 U.S. at 300–02 (citing evidence that "during the 26 years of public operation, the [transit] system . . . had not accepted or permitted any political or public issue advertisement on its vehicles"); Greer, 424 U.S. at 839 ("It is undisputed that, until the appearance of the respondent Spock at Fort Dix on November 4, 1972, as a result of a court order, no candidate of any political stripe had ever been permitted to campaign there."); see also AFDI, 901 F.3d at 373 (noting that "information on how [an advertising policy] has been applied would certainly be information as to whether it is capable of reasoned application"); Shore Transit, 580 F. Supp. 3d at 193–94 (refusing to dismiss challenge to ban on advertisements that are "political," "controversial, offensive, objectionable, or in poor taste" in part because that language "provide[d] no additional limiting guidance" and absent a

"robust factual record," court could not "make any conclusions regarding . . . whether Defendants have arbitrarily enforced" it).

### ii.   Application

With these authorities in tow, the Court returns to the guidelines at issue.  Recall, once again, that Guideline 9 bans ads "intended to influence" the public "regarding an issue on which there are varying opinions."  Compl., ¶ 27.  Although the word "political" — which the circuits have uniformly deemed too broad when used in naked form — does not appear in this guideline, the Court nevertheless finds that its language is equally vague if not more so.  Virtually anything can constitute an "issue" on which opinions vary — from Yankees versus Red Sox to the correct pronunciation of "tomato."  See Suburban Mobility, 978 F.3d at 497 ("There are plenty of nonpolitical issues on which members of society disagree.").

In some of the cases already discussed, moreover, courts have rejected efforts by parties to define what is political by reference to contested "issues" as singularly unhelpful.  See, e.g., Mansky, 138 S. Ct. at 1889 (rejecting definition of "political" that relies on "issues that have been raised" in an election campaign because "[a] rule whose fair enforcement requires an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot is not reasonable"); Suburban Mobility, 978 F.3d at 495–96 (rejecting definition of "politicized issue" as an issue on which "society is fractured" because it is "subject to the same risk of 'haphazard interpretations' that Mansky found unacceptable"); see also Amalgamated Transit Union, 929 F.3d at 654 (suggesting that policy excluding "any issue having any level of public debate" would be "unreasonable" because "for most every good or service, there is some level of debate") (cleaned up).  In short, considering Guideline 9's sweeping scope and nebulous boundaries, it is difficult to escape the conclusion that it is unreasonable.

Guidelines 13 and 14, on the other hand, are sufficiently specific and unlike the policies declared unreasonable by other courts.  Because Guideline 13 singles out ads that "support or critici[ze]" an "industry position or goal," Compl., ¶ 28, it is considerably narrower than a blanket ban on "political" ads and similar to the kind of speech-restrictive phraseology the D.C. Circuit has previously considered acceptable.  See Archdiocese, 897 F.3d at 320, 330 (finding that another one of WMATA's advertising guidelines (Guideline 12), which prohibits ads that "promote or oppose any religion, religious practice or belief," was reasonable); id. at 340 (Wilkins, J., concurring) (explaining that Guideline 12's language "is narrower and more precise than simply a general ban on 'religious' or 'political' speech"); Zukerman, 961 F.3d at 451 (citing J. Wilkins concurrence in Archdiocese and emphasizing that "the step from a blanket ban" to one with "workable limits" is "critical").

As mentioned earlier, moreover, because Guideline 13 limits its prohibition to ads that seek no "direct commercial benefit" to the advertiser, it is consistent with the commercial/non-commercial distinction that courts have blessed as a basis for restricting advertising in non-public forums.  See Archdiocese, 897 F.3d at 329 (noting "longstanding recognition that the government may limit a non-public forum to commercial advertising").  While there will inevitably be some ads that straddle that line, the Court has no reason to believe that the ambiguity goes "beyond close calls on borderline or fanciful cases."  Mansky, 138 S. Ct. at 1891.

Guideline 14, which restricts ads "intended to influence public policy," admittedly bears some resemblance to Guideline 9.  See Compl., ¶ 29.  But it is considerably narrower in one crucial respect: the ultimate object of influence is "public policy," a term implying formal governmental action.  See Policy, Merriam-Webster.com, (last visited Dec. 19, 2023) (defining "policy," in relevant part, as "a definite course or method of action selected from among

alternatives" or "a high-level overall plan embracing the general goals and acceptable procedures especially of a governmental body").  Not all ads denominated "political" are specifically aimed at bringing about a governmental action.  The Court believes that this difference in language sufficiently delimits the scope of the guideline for purposes of the reasonableness analysis.  And White Coat offers nothing to the contrary.

One final issue bears mention.  White Coat protests the dismissal of its reasonableness claims at this juncture because the relevant circuit decisions are almost always informed by a factual record (typically arriving on appeal from post-trial orders or decisions on summary judgment or preliminary injunctions).  See Pl. Opp. at 14–15 (collecting cases); id. at 17.  While Plaintiff's point is well taken, it says little about the propriety of conducting what is largely an interpretive inquiry at the pleading stage.  Roughly half of the cited cases predate the elevated pleading standard introduced in Twombly and Iqbal.  And in several of the more recent ones, no motion to dismiss was even filed.  See e.g., Ctr. for Investigative Reporting v. Se. Pennsylvania Transp. Auth., No. 18-1839 (E.D. Pa.); Am. Freedom Def. Initiative v. Suburban Mobility Auth. For Regional Transp., No. 10-12134 (E.D. Mich.).  The bottom line is that Guidelines 13 and 14 facially provide a workable standard, and the Complaint contains no non-conclusory allegations that would suggest that they are enforced in an arbitrary and inconsistent manner.  Its First Amendment reasonableness claims against both therefore cannot proceed.

In sum, the Motion to Dismiss White Coat's First Amendment count shall be denied as to Guideline 9 (solely on the theory that the guideline is unreasonable) but granted in full as to Guidelines 13 and 14.

2.  *Due Process*

Defendant last argues that White Coat fails to state a claim under the Fifth and Fourteenth Amendments because none of the guidelines is impermissibly vague.  See MTD at 16–19.  "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing City of Chicago v. Morales, 527 U.S. 41, 56– 57 (1999)).

The Court notes, as a preliminary matter, that it is "not entirely clear that the vagueness doctrine applies to [WMATA's] Guidelines, which do not, of course, impose criminal penalties on those whose advertisements are denied."  AFDI, 901 F.3d at 372.  As Defendant does not raise the issue, the Court will assume without deciding that the count is legally viable.  White Coat defends its vagueness claim on "substantially the same" grounds as its First Amendment unreasonableness claim.  See Pl. Opp. at 26 (noting, as to both claims, that issue is that "what comes in and what stays out is not clear").  As WMATA also essentially stands on its arguments regarding speech, the Court agrees that the outcome on this count is the same.

One last wrinkle: Defendant has raised at least one argument for dismissal of the vagueness count as to Guideline 9 (and every other guideline) that it did not assert in relation to the First Amendment claim.  That is, advertisers "can clarify the meaning of the Guidelines through WMATA's administrative process," which caselaw suggests would "further mitigate[] any vagueness concerns."  MTD at 18 (citing Bellion Spirits, LLC v. United States, 7 F.4th 1201, 1214 (D.C. Cir. 2021)).  The D.C. Circuit in Bellion Spirits, however, had already concluded that the agency regulation at issue withstood the plaintiff's vagueness challenge before adding that

any vagueness concerns were mitigated by the opportunity for clarification.  Id.  The case that it cited for that proposition, moreover, Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489 (1982), merely notes that the existence of clarification procedures is one (among several) factors bearing on the degree of specificity the Constitution requires.  See id. at 498. Neither case implies that such procedure, on its own, could save a regulation that is otherwise vague on its face.

In short, White Coat has stated a claim for vagueness as to Guideline 9, but not as to Guidelines 13 and 14 for the reasons stated earlier.  Supra Part II.B.1.b.

## IV.    Conclusion

For the foregoing reasons, the Court will grant the Motion to Dismiss except as to the First Amendment reasonableness claim and the Fifth Amendment vagueness claim regarding Guideline 9 that White Coat asserts against WMATA's general manager.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  January 5, 2024