UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WHITE COAT WASTE PROJECT,** <br><br> Plaintiff, <br><br> v. <br><br> **RANDY CLARKE,** <br><br> Defendant. | Civil Action No. 23-1866 (JEB) |

## MEMORANDUM OPINION

In the spring of 2023, Plaintiff White Coat Waste Project sought to display around the D.C. Metrorail system four advertisements opposing government-funded experiments on animals. The Washington Metropolitan Area Transit Authority — which operates the Metro — rejected the ads on the ground that they violated three of its advertising-content guidelines. White Coat then sued for declaratory and injunctive relief, alleging that this decision violated its free-speech and due-process rights. Defendants responded with a motion to dismiss, which the Court granted in part and without prejudice. More specifically, while it found WMATA itself immune from suit and two of its policies — Guidelines 13 and 14 — neither vague nor unreasonable, it allowed the challenge to the third policy — Guideline 9 — to proceed against its general manager, Defendant Randy Clarke.

Now armed with a bevy of examples of WMATA's purportedly applying Guidelines 13 and 14 in an arbitrary and inconsistent manner, White Coat seeks to revive its free-speech and due-process challenges to both via an Amended Complaint. Because those claims are now

1

supported by factual allegations sufficient to withstand a motion to dismiss, the Court will permit the amendment.

I.   **Background**

Since the Court canvassed the basic facts of this case in its prior Opinion, only a brief reprise is necessary here before turning to White Coat's new allegations. See White Coat Waste Project v. WMATA, 2024 WL 68256 (D.D.C. Jan. 5, 2024). As required at this stage, the Court will draw its summary from the proposed Amended Complaint.

White Coat is a non-profit watchdog organization that aims to "unite animal-lovers and liberty-lovers to expose and end wasteful taxpayer-funded animal experiments." ECF No. 25-1 (Am. Compl.), ¶ 7. On April 13, 2023, it contacted Outfront Media — the company that manages WMATA's advertising sales and placement — to place four advertisements. Id., ¶¶ 23, 33. Three of them displayed the organization's logo, which reads "Stop Government Animal Experiments." Id., ¶ 32. Of those, two included stylized illustrations of the kinds of experiments the government (presumably) funds, along with relevant dollar figures. Id. All three were rejected under WMATA Commercial Advertising Guidelines 9, 13, and 14, which state as follows:

> Guideline 9: Advertising intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.
>
> Guideline 13: Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited.
>
> Guideline 14: Advertisements that are intended to influence public policy are prohibited.

Id., ¶ 37. The fourth ad displayed only White Coat's name, the statement "Shop Now!," and a QR code linking to a webpage where the organization sells t-shirts displaying its "Stop Government Animal Experiments" logo. Id., ¶ 32. It was eventually approved. Id., ¶ 36.

White Coat subsequently sued WMATA and its interim general manager on June 27, 2023, alleging two counts: 1) these guidelines violate the First Amendment because they each discriminate against Plaintiff's viewpoint and are unreasonable because they lack a workable standard; and 2) they are impermissibly vague in violation of the due-process clauses of the Fifth and Fourteenth Amendments. See ECF No. 1 (Compl.), ¶¶ 35–45. Following Defendants' Motion to Dismiss, the Court dismissed WMATA from the action as immune from suit and also dismissed without prejudice all claims against the sole remaining defendant (Randy Clarke) except the First Amendment reasonableness claim and the Fifth Amendment vagueness claim, both regarding Guideline 9. See White Coat, 2024 WL 68256. After finding no viewpoint discrimination, the Court concluded that Guidelines 13 and 14 were reasonable under the First Amendment because they "facially provide a workable standard, and the Complaint contains no non-conclusory allegations that would suggest that they are enforced in an arbitrary and inconsistent manner." Id. at *10. Further, because the parties had litigated the vagueness challenge to both guidelines on "substantially the same" grounds as the First Amendment reasonableness challenge, the Court found neither impermissibly vague for the same reason. Id.

In a bid to cure these deficiencies, Plaintiff has now moved to amend its Complaint to describe in greater detail WMATA's purportedly arbitrary ad-placement practices, including a plethora of ads run within the Metro system in apparent violation of one or both guidelines, as well as ads rejected under Guideline 14 that they believe comply with its requirements. These examples, Plaintiff argues, provide the non-conclusory allegations of "arbitrary and inconsistent"

3

enforcement that the Court found absent in the original Complaint, and they thus revive its previously dismissed reasonableness (First Amendment) and due-process (Fifth and Fourteenth Amendments) challenges to Guidelines 13 and 14. In sum, aside from its viewpoint-discrimination claim, White Coat seeks to restore against Clarke all of the claims in its original Complaint. Clarke, for his part, opposes the amendment as futile.

## II. Legal Standard

A plaintiff may amend his complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading. See Fed. R. Civ. P. 15(a)(1). Otherwise, he must seek consent from the defendant or leave from the court. The latter "should [be] freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). In deciding whether to grant leave to file an amended complaint, courts may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962). In this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason." Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996). Under Rule 15, furthermore, "the non-movant generally carries the burden in persuading the court to deny leave to amend." Nwachukwu v. Karl, 222 F.R.D. 208, 211 (D.D.C. 2004).

It is clear, however, that amendment should not be permitted if it would be futile. In other words, if the amendment is facially infirm, courts need not grant leave. See In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) ("[A] district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss.") (citing Foman, 371 U.S. at 182, for proposition that "'futility of amendment' is permissible justification

4

for denying Rule 15(a) motion"); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (same).

### III.   Analysis

The Court begins by addressing a source of confusion arising from Defendant's Opposition to the Motion to Amend. Clarke argues at length that White Coat fails to state a claim that Guideline 9 is unreasonable or impermissibly vague. See ECF No. 29 (Def. Opp.) at 8–18, 20. The Court, however, already dispensed with those contentions in its January 5 Opinion partially denying his motion to dismiss. Accordingly, Guideline 9 is simply not at issue this time around. See ECF No. 30 (Reply) at 18–19.

To the extent that Clarke intends for his Opposition to function as a request for reconsideration of this question, it is both procedurally improper and substantively deficient. The Court will not reconsider its prior decision except upon a properly filed motion pursuant to Federal Rule of Civil Procedure 54(b), which governs interlocutory orders such as the denial of a motion to dismiss. See, e.g., TIG Ins. Co. v. Republic of Argentina, 2022 WL 3594601, at *4 n.5 (D.D.C. Aug. 23, 2022). In any event, were his Opposition characterized as such a motion, the Court would deny it. Although the Rule permits amendment of an order "as justice requires," the standard is hardly a free pass; it may be met only where, for example, the court "has patently misunderstood" the parties, strayed far afield from the issues presented, or failed to consider "a controlling or significant change in the law or facts . . . since the submission of the issue." Cobell v. Norton, 224 F.R.D. 266, 272 (D.D.C. 2004). Clarke has shown nothing of the sort. See Def. Opp. at 15–18 (alleging only that the Court "gave insufficient consideration to Guideline 9's limiting standards" and then proceeding to rehearse points raised in the prior motion to dismiss); see also id. at 20. If anything, the landscape has changed to his detriment.

5

Just one week after his Opposition was filed, another court in this district preliminarily enjoined the enforcement of Guideline 9 against another non-profit advertiser after independently finding that it was incapable of reasoned application. See WallBuilder Presentations v. Clarke, 2024 WL 2299581 (D.D.C. May 21, 2024). This Court sees no reason, at this stage, to retreat from its conclusion.

On now to the main event. Clarke opposes Plaintiff's Motion as futile because the proposed Amended Complaint fails to state a claim that Guidelines 13 and 14 are unreasonable in violation of the First Amendment or impermissibly vague in violation of the Fifth and Fourteenth Amendments. Having previously prevailed on his contention that the language of each guideline alone is sufficiently clear, Clarke now maintains that Plaintiffs' freshly pled examples of inconsistent enforcement do not move the needle. Before probing the merits of that position, the Court must clarify the role such evidence plays within the respective doctrinal frameworks of reasonableness and vagueness claims.

 A. Legal Frameworks

  1. *Reasonableness*

A speech restriction in a non-public forum (such as the advertising spaces within the D.C. Metro system) must be reasonable. See Am. Freedom Def. Initiative v. WMATA, 901 F.3d 356, 365 (D.C. Cir. 2018). "The reasonability inquiry is not a demanding one, but rather is a forgiving test. The challenged restriction need not be the most reasonable or the only reasonable limitation." Archdiocese of Washington v. WMATA, 897 F.3d 314, 329–30 (D.C. Cir. 2018) (cleaned up). It need satisfy only two conditions. First, it must be "consistent with the government's legitimate interest in maintaining the property for its dedicated use." AFDI, 901

6

F.3d at 370.  Second, it must guide the state's discretion by providing "objective, workable standards."  Id. at 372.

Defendant, it seems, thinks allegations of inconsistent application further a claim only that the Authority's ad-content policy — even if clear on its face as a matter of linguistic interpretation — is unreasonable "as applied."  Def. Opp. at 8.  And White Coat appears to share that understanding.  See Am. Compl., ¶ 76 (amending Count I to now allege that "[t]he challenged advertising guidelines . . . are not capable of reasoned application . . . as-applied to White Coat's proposed advertisements").

While the doctrines are admittedly nuanced, such inconsistency is better understood as bearing on whether the guidelines are facially reasonable.  Although the distinction between facial and as-applied challenges is not "well defined," Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010), it generally "goes to the breadth of the remedy employed by the Court," and not to "[t]he substantive rule of law," which "is the same for both challenges." Edwards v. Dist. of Columbia, 755 F.3d 996, 1001 (D.C. Cir. 2014) (cleaned up).  To mount a facial challenge, a plaintiff must show that "no set of circumstances exists under which [the law] would be valid," the law "lacks any plainly legitimate sweep," or the law is overbroad because "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep."  Id.  "Conversely, to prevail on an as-applied First Amendment challenge, [plaintiffs] must show that the regulations are unconstitutional as applied to their particular speech activity."  Id.

Recall that the Supreme Court in Minnesota Voters Alliance v. Mansky, 585 U.S. 1 (2018), articulated a requirement that to be reasonable, a speech restriction in a nonpublic forum must be "capable of reasoned application" and provide "objective, workable standards."  Id. at

7

21, 23. Animating this principle was a concern that "covert forms of discrimination . . . may result when arbitrary discretion is vested in some governmental authority." Id. (citation omitted). Whether such discretion is evident from the amorphousness of the law's language or a history of inconsistent enforcement (manifesting the ills that a clearer standard would forestall), the inference Mansky demands is the same: the law fails to provide a "sensible basis for distinguishing what may come in from what must stay out." Id. at 16; see also Archdiocese of Washington v. WMATA, 897 F.3d 314, 330 (D.C. Cir. 2018) ("[A] challenged regulation may be unreasonable . . . if it is inconsistently enforced" or, alternatively, "if it is unclear what speech would be swept in or otherwise seriously hamper consistent administration[.]"). Because that deficiency would persist regardless of the circumstances under which the law is applied, the law would be invalid on its face. See Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth., 89 F.4th 1337, 1350 (11th Cir. 2024) ("[A]s a logical matter, a law (or, as here, a policy) found to be constitutionally unreasonable under Mansky due to lack of standards and guidance is by definition facially invalid.") (emphasis added); White Coat Waste Project v. Greater Richmond Transit Co., 35 F.4th 179, 204 (4th Cir. 2022) (if a "policy is not 'capable of reasoned application,' it is logically unavoidable that [it] lacks any legitimate sweep").

This is not to suggest that any single instance of prior inconsistent application is actionable in itself or would render a speech-restrictive policy invalid *in toto*. Rather, it functions as evidence (to be weighed against any countervailing evidence) that the policy in question does not sufficiently curtail official discretion. See Am. Freedom Def. Initiative v. WMATA, 901 F.3d 356, 373 (D.C. Cir. 2018) ("[I]nformation on how [Guideline 9] has been applied would certainly be information as to whether it is capable of reasoned application."); see also Ostrewich v. Tatum, 72 F.4th 94, 105 (5th Cir. 2023) (finding statutory provision reasonable

despite "many examples of Texas officials inconsistently applying" it), cert. denied sub nom. Ostrewich v. Hudspeth, 144 S. Ct. 570 (2024). Mansky, after all, acknowledged that "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," and "some degree of discretion" is often necessary, so long as the difficulties do not "go beyond close calls on borderline or fanciful cases." 585 U.S. at 21.

In evaluating whether White Coat's newly pled examples of inconsistent enforcement call into question the Court's prior determination, the Court proceeds with this understanding.

2. *Vagueness*

The role of inconsistent enforcement in a vagueness challenge is similar. As a general matter, a statute "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing City of Chicago v. Morales, 527 U.S. 41, 56–57 (1999)). Particularly in light of the latter avenue, "[e]vidence of arbitrary or discriminatory enforcement of a statute is of course relevant to a vagueness claim and is routinely considered by courts." Cornelio v. Connecticut, 2017 WL 2271667, at *7 (D. Conn. May 24, 2017), aff'd, 708 F. App'x 41 (2d Cir. 2018); see also Jones v. Schneiderman, 974 F. Supp. 2d 322, 340 (S.D.N.Y. 2013) (collecting cases). Such evidence must ultimately be tied to ambiguity in the text because "[i]nconsistent application of a statute does not render its text incomprehensible, as even a law composed with perfect clarity can be inconsistently enforced." United States v. Barnes, 481 F. Supp. 3d 15, 27 (D.D.C. 2020); Cornelio, 2017 WL 2271667, at *7 (explaining that such "evidence needs to directly relate to the alleged vagueness and ambiguity of the statute").

While there are differences in the doctrinal requirements of vagueness and reasonableness claims, the Court notes, at this juncture, that Defendant has largely tethered his objection to White Coat's revived vagueness claims to his objection concerning reasonableness — *i.e.*, that the proffered ad-placement decisions do not in fact evince inconsistent enforcement. See Def. Opp. at 20 ("Because . . . [the] proposed amended complaint's challenges to [the Guidelines] as unreasonable fail to state a claim, the vagueness challenges to those Guidelines also fail."); see also Reply at 20 ("Clarke attacks the vagueness claims on the same basis that he attacks the First Amendment claims."). The only other contentions he makes that are unique to vagueness can be quickly dispensed with. First, he suggests that "any claim of vagueness" is undercut by "plaintiff's own understanding . . . that the Guidelines do not permit noncommercial ads that advocate a position on an issue of divided public opinion." Def. Opp. at 20. Clarke cites no specific portion of the Amended Complaint for that proposition, and, in any event, it belies Plaintiff's clear and repeated protestation that WMATA has allowed noncommercial ads of that nature. Id. Second, he suggests that WMATA has an "administrative process" for clarifying its guidelines, which mitigates their vagueness. Id. at 21. The Court already rejected that argument in its prior Opinion. See White Coat, 2024 WL 68256, at *10 ("Neither case [on which Defendant relies] implies that such procedure, on its own, could save a regulation that is otherwise vague on its face.").

Absent any other distinct basis for dismissing White Coat's vagueness challenge, the Court will simultaneously evaluate the impact of the new allegations of inconsistent enforcement on both types of claims.

10

B. <u>Application</u>

With that framing in mind, the question now is whether White Coat's new allegations fail to state a claim that Guidelines 13 and 14 are unreasonable under <u>Mansky</u> and unconstitutionally vague for the reasons Clarke has asserted. Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> A court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. <u>Trudeau v. Fed. Trade Comm'n</u>, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)). For a plaintiff to survive a 12(b)(6) motion, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555–56. The Court considers each guideline separately.

1. *Guideline 13*

Begin with Guideline 13. The Court previously ruled that the guideline is reasonable on its face because it "singles out ads that 'support or critici[ze]' an 'industry position or goal,'" which makes it "considerably narrower than a blanket ban on 'political' ads," and its limitation to ads that seek no "direct commercial benefit" to the advertiser make it "consistent with the commercial/noncommercial distinction that courts have blessed as a basis for restricting advertising in non-public forums." <u>White Coat</u>, 2024 WL 68256, at *9 (citations omitted). White Coat now raises a number of examples of prior ad-placement decisions and specific

11

aspects of WMATA's advertising policies that it believes renders their enforcement arbitrary and inconsistent.  See Reply at 5–18.

For example, Plaintiff now alleges that WMATA approved an advertisement by Power to the Patients — a nonprofit organization "dedicated to promoting transparency in hospital pricing."  Am. Compl., ¶ 56.  The ad declared, "WE ~~NEED~~ DEMAND HOSPITAL PRICES," with the word "need" stricken through.  Id.  It contained a picture of the musician Fat Joe, whom it quoted as stating, "When we can't see or compare prices, hospital and insurance companies charge us whatever they want. They're robbing us!"  Id.  It also featured a weblink and QR code linking to the organization's website, powertothepatients.org, which, according to Plaintiff, "addresses the need for 'real prices and transparency in healthcare' as required by existing federal law."  Id.  It is difficult to interpret this advertisement as doing anything other than staking out a position that key players in the medical and health-insurance industries should disclose the cost of medical services to patients.  As Power to the Patients is a non-profit entity, and the ad does not evidently sell anything for its direct commercial benefit, it would appear to violate Guideline 13 for the same reason as White Coat's ads do.

Even setting aside the content of the ad, it is unclear why the material on the organization's website (to which the ad links) would not also violate Guideline 13.  White Coat alleges that WMATA "may review any website that is provided on the advertisement either in text or in the form of a QR code," and it may "reject a proposed advertisement if any page on the website violates [its] various guidelines."  Am. Compl., ¶ 28.  It also alleges that there is no formal, written policy authorizing such review or delimiting its scope.  Id.  This is borne out by White Coat's own experience.  Outfront Media (WMATA's advertising-placement agency) initially informed the organization that it was "unable to review" the fourth proposed

advertisement because the QR code led to a "placeholder page." Id., ¶ 34. The ad was approved only after White Coat resubmitted it with a functioning link to a webpage selling t-shirts branded with its logo. Id., ¶¶ 35–36. It is also borne out by the experience of the plaintiff in WallBuilder, whose proposed ads were rejected by WMATA under Guideline 9 because they contained QR codes linking to their website, which in turn "contain[ed] clear advocacy." 2024 WL 2299581, at *4.

Given that Power to the Patients' avowed purpose is to oppose an industry practice — again, the lack of hospital-pricing transparency — it seems obvious that the content of its website (if WMATA reviewed it) would likely violate Guideline 13 in the same manner as the content of its ad. Defendant's lack of consistency on this score further casts doubt on whether this guideline (and any other guideline it might apply to linked websites) is capable of reasoned application. See White Coat Waste Project v. Greater Richmond Transit Co., 35 F.4th 179, 200–01 (4th Cir. 2022) (Greater Richmond Transit Company's practice of occasionally applying its ad policy to websites linked to in an ad "vastly expand[ed] the scope of the [policy's] reach" and "compounded" its "ambiguity."); WallBuilder, 2024 WL 2299581, at *13 n.8 ("[I]f WMATA had a policy of always looking at websites referenced in ads, its process would be considerably more consistent. . . . [W]hile WMATA purportedly 'may' review any website or QR code referenced in a proposed ad, such a review is neither consistently performed . . . nor triggered by a well-articulated process, let alone a process transparent to the public.") (citation omitted).

One other prior advertisement that White Coat highlights at least raises the specter that inconsistency in the enforcement of Guideline 13 might be more than an occasional issue. WMATA ran an advertisement for a nonprofit organization called "World Beyond War," which sees itself as spearheading a "global movement to end all wars." Am. Compl., ¶ 57. The ad

13

contained the message "Peace on Earth" and a link to the organization's website. Id. Of course, one reasonable interpretation of the ad might be that it promotes world peace as an aspiration without regard for the goals of any particular industry. It might also be viewed, depending on additional context regarding its advocacy practices, as opposing the goals of the defense industry. See Reply at 8. While this is admittedly an edge case, the Court must accept White Coat's allegations as true and draw "all reasonable inferences" in its favor, Menoken v. Dhillon, 975 F.3d 1, 8 (D.C. Cir. 2020), including that this ad opposed an industry position.

The Court thus finds that White Coat has alleged facts sufficient to raise an inference that Guideline 13 is arbitrarily enforced — namely, multiple instances of inconsistent enforcement that plausibly demonstrate problematic ambiguity in the meaning of "industry position" as used in the guideline. Plaintiff's First Amendment and vagueness challenges to Guideline 13 would therefore survive a motion to dismiss on the grounds Clarke has raised.

  2. *Guideline 14*

As to Guideline 14, the Court previously ruled that, although its language "bears some resemblance to Guideline 9," it was "considerably narrower" insofar as it targeted advertisements "intended to influence public policy," which generally implies "formal governmental action." White Coat, 2024 WL 68256, at *10 (emphasis added). White Coat, once again, alleges several examples of inconsistency in WMATA's prior implementation of the guideline.

To name just a few persuasive examples: WMATA rejected an ad by the American Civil Liberties Union Foundation, which publicized its 2018 Membership Conference under Guidelines 9 and 14. See Am. Compl., ¶ 44. It stated, "YOU BELONG HERE" and provided the conference location, the date, and a list of speakers, along with a link to aclu.org. Id. There is no plausible sense in which the ad itself attempts to "influence public policy." And to the

14

extent the rejection was based on content within the ACLU's website, it only highlights the problems referenced earlier with WMATA's unwritten (and seemingly variable) practice of applying its ad-content policies to linked webpages.

The Authority also initially approved and then rejected (under Guidelines 9 and 14) advertisements for the book *Dangerous* by Milo Yiannopoulos. Id., ¶¶ 53–54. The ads merely featured Yiannopoulos's face, the book's title, the statement "Pre-Order Now," and quotations from book reviews, such as "The most hated man on the Internet" and "the ultimate troll." Id. Here, too, the ad itself does not appear to advocate any particular governmental action, even though the content of the book may be considered "political." But see ACLU v. WMATA, 303 F. Supp. 3d 11, 19 (D.D.C. 2018) (finding it reasonable to conclude that by promoting a "manifestly political book," the ad for Yiannopoulos's book violated Guideline 14). At the very least, the example makes it clear that even certain commercial ads are barred by Guideline 14, which, as the WallBuilder court put it, "begets the question: At what point does a commercial ad become prohibited" under the guideline? See 2024 WL 2299581, at *15.

The "Power to the Patients" ad discussed earlier would also seem to contravene Guideline 14 to the extent it advocates a change in government policy, but WMATA allowed it to run. In fact, the plaintiff in WallBuilder, who (successfully) challenged Guideline 9 as unreasonable, mentioned WMATA's decision to run this ad as evidence that the guideline lacks a workable standard. Id. at *15. And the court largely agreed, noting that "WMATA's characterization of the Power to the Patients ad as merely seeking to 'educate,' rather than 'to influence the public on significant issues,' is difficult — if not impossible — to reconcile with the ad's text, which 'demand[s]' change." Id. at *16. It very well may be that, with the benefit of additional factual context, this ad can be cast as a public-service announcement exhorting

15

patients to exercise rights they already possess, rather than a plea for further government intervention. At this stage, however, the Court must afford Plaintiff the benefit of all reasonable inferences, including that the ad is intended to influence public policy contrary to Guideline 14.

The Court finds that these examples show that Guideline 14 may be being applied inconsistently — presumably in part because of ambiguity regarding what constitutes an "influence" on public policy. White Coat's reasonableness and vagueness claims as to this guideline would thus survive a motion to dismiss on the grounds Clarke has raised.

\* \* \*

The Court is mindful, ultimately, that leave to amend should be "freely give[n]" when "justice so requires." Fed. R. Civ. P. 15(a)(2). In light of such standard and the fact that the amendments are not futile, the Court will grant leave to file the Amended Complaint.

It bears emphasizing, however, that even though Plaintiff has shown that its Amended Complaint would survive a motion to dismiss, this does not constitute a final determination on the merits. Nor does it imply that the foregoing examples of inconsistency would, on their own, suffice to prove that either Guideline 13 or 14 is vague or incapable of reasoned application. That ultimate question must be addressed with the benefit of a more robust factual record following discovery and with the knowledge that Clarke need not produce an unerringly consistent record of enforcement to satisfy Mansky's relatively undemanding standard or the requirements of the Due Process Clause. See Archdiocese, 897 F.3d at 329–30; Metro. Washington Chapter v. Dist. of Columbia, 57 F. Supp. 3d 1, 30–31 (D.D.C. 2014); see also People for Ethical Treatment of Animals, Inc. v. Shore Transit, 580 F. Supp. 3d 183, 194 (D. Md. 2022) (finding that, absent such record, court "cannot make any conclusions regarding the types

of advertisements Defendants generally permitted, nor whether Defendants have arbitrarily enforced the advertising prohibitions").

## IV.     Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion for Leave to Amend. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 11, 2024